(C. D. 1428)

KEUFFEL & ESSER CO. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided June 11, 1952)

*John D. Rode* for the plaintiff.

*Charles J. Wagner*, Acting Assistant Attorney General (*Arthur R. Martoccia*, special attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: The importation under consideration consists of what are known as increment borers made up of three parts, a handle, an auger, and an extractor. The articles were classified by the col-

lector of customs pursuant to the provision for "other cutting tools" in paragraph 396 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 396) and duty was imposed thereon at the rate of 45 per centum ad valorem. The importer claims that the devices should have been classified in accordance with the provision in paragraph 397 of said act (19 U. S. C. § 1001, par. 397) as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, as articles or wares not specially provided for, composed wholly or in chief value of steel, and dutiable at 22½ per centum ad valorem.

The testimonial record consists of the testimony of but one witness who was called by the plaintiff. A sample of the merchandise was received in evidence as collective illustrative exhibit 1. A sheet of paper taken from a catalog issued by the plaintiff company was received in evidence as illustrative exhibit 2 which shows in graphic form the device in its various parts and also when adjusted for use. It was agreed between the parties litigant that the articles are wholly or in chief value of steel.

The witness, Robert W. Anderson, testified that he was in charge of the production department of plaintiff company with which he had been associated since 1941, engaged in the handling of engineering instruments and supplies such as squares, triangles, drawing instruments, slide rules, scales, transits, levels, and alidades. He described the imported articles as follows:

The device consists of three parts. This is the handle, the auger and the extractor. The auger is inserted in the handle, and locked in place with a latch. The extractor is set aside. The device is then taken and by pressure against the outside of a tree and directed toward the center of the trunk by pressure and turning, you project the auger into the tree until you reach the desired depth. While the auger is still in the tree, the extractor is inserted through the hollow portion of the auger to its full position. Then, the whole device is backed out of the tree by turning in the reverse direction. Then, by unloosening the latch, the specimen can be drawn out from it.

\* \* \* \* \* \* \*

A specimen of the tree from the bark through the center of the tree, \* \* \*.

\* \* \* \* \* \* \*

The purpose is to determine the nature of the grain structure. Any rotten portion or the like that the tree might contain, it is in standing timber. It is also used by telephone and telegraph companies to examine telephone poles. The whole purpose is to get a sample of the tree or sample of standing wood from the outside to the center. They come in various lengths for various sizes of trees, from two and a half to about twenty-four inches in length, and that fundamentally was the only purpose of the device.

It should be noted that the device is operated manually and its only purpose is as above described. The witness further testified that—

The only customers we have for that article are forestry schools and colleges and universities and the telephone companies and telegraph companies and the United States Department of Forestry.

Paragraph 396, in which the importation was classified, reads as follows:

Drills (including breast drills), bits, gimlets, gimlet-bits, countersinks, planes, chisels, gouges, and other cutting tools; pipe tools, wrenches, spanners, screw drivers, bit braces, vises, and hammers; calipers, rules, and micrometers; all the foregoing, if hand tools not provided for in paragraph 352, and parts thereof, wholly or in chief value of metal, not specially provided for, 45 per centum ad valorem.

The context of the paragraph leaves no room for doubt that bits, gimlets, and gimlet-bits, for instance are regarded as "cutting tools." The implement here in controversy, especially the portion designated as an auger, functions in like manner to a gimlet and is so constructed with a cutting property that it is used to bore a hole in a tree or telephone pole and, being operated manually, would seem to answer the call of said paragraph 396. The mere fact that its purpose may be to secure a specimen of the tree structure rather than to bore a hole for some other practical use would seem to be a matter of no particular consequence so far as the dutiable classification of the article is concerned.

Paragraph 396, *supra*, does not specify use as a consideration for classification of the articles named therein. Hence, we are not concerned with the purpose for which these increment borers are used, but rather with their structure and the means by which they operate. The augers are threaded and have a sharp cutting edge at the end of the auger where it penetrates the tree or pole, and it is this cutting property which enables the borers to function properly. Likewise, the extractor, which is a semicircular shaft the same length as the auger, is serrated at one end for about an inch and three-quarters, and terminates in a keen cutting edge.

Upon the facts of record, we are clearly of the opinion that the increment borers here under consideration are, in fact, cutting tools within the meaning of said paragraph 396, *supra*, as classified by the collector of customs, and are properly dutiable at the rate of 45 per centum ad valorem.

The protest is overruled and judgment will be entered accordingly.